## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Kenneth Smith, being first duly sworn on oath, hereby depose and say:

## I. EXPERIENCE

1. I am employed as a detective for the Milwaukee Police Department (MPD), and have been a law enforcement officer for 19 years. I have been a detective for the past 4 years and have worked the majority of that time on drug investigations. For the last 3 years and 3 months, I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) Joint Drug Gang Task Force. I am also a federally deputized task force agent for the United States Department of Justice, Drug Enforcement Administration (DEA). During this time I have almost exclusively investigated violations of controlled substances laws and money laundering laws (Title 21, United States Code, 841 (a)(1), 846, and Title 18, United States Code, 1956 and 1957) and other related offenses.

2. During the course of my employment, I have participated in at least 250 investigations involving the distribution of controlled substances. I have participated in the execution of approximately 200 search warrants in the capacity of affiant and/or participant. These warrants covered the search of locations ranging from the residences of targets, their associates and relatives, stash houses used as drug and money storage locations by drug dealers, business offices used by drug dealers as fronts for their illegal activities, and vehicles utilized to transport or store controlled substances. Evidence searched for and recovered in these locations has included: controlled substances, firearms, records pertaining to the expenditures of drug profits, monetary instruments and various valuable assets including jewelry, precious metals and gems purchased with the proceeds of drug trafficking. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving large amounts of cocaine, cocaine

base (crack cocaine), marijuana, and/or other controlled substances, I know and have observed the following:

A. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

B. I have also relied upon informants to obtain controlled substances from dealers;

C. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking activities. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

D. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

E. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

F. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms and ammunition, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons, as well as records or receipts pertaining to firearms and ammunition;

G. I have been the case agent during court-authorized interceptions of communications, have applied for and received permission to intercept wire communications, and have experience operating the equipment utilized to conduct such operations;

H. I know that drug dealers often put telephones in the names of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

I. I know that large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to

avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

J. I know that large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

K. I know that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

L. I know that it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

M. I know that it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within their residences, businesses or other locations over which they maintain dominion and control;

N. I know that large-scale drug traffickers often use electronic equipment such as telephone (land-lines and cellphones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

O. I know that when drug traffickers amass large proceeds from the sale of drugs, that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

P. I know that the sale of cocaine, crack, marijuana, and other controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

Q. I know that it is common for drug traffickers to physically handle and count the "street money" after receiving it in exchange for the drugs thereby leaving residue traces of drugs on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of drugs and residue traces of drugs; and that those trained dogs have reacted to drug-tainted currency negotiated at banks and concealed in drug traffickers' homes;

R. I know that it is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

S. I know that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed, may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

T. I know that the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

U. I know that in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

V. I know that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year in which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their homes and businesses;

W. I know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

X. I know that cocaine, crack, and marijuana traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

Y. I know that drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs. That these traffickers usually maintain these photographs in their possession.

3. This affidavit is based on my personal knowledge, information reported to me by other federal, state, and local law enforcement officers[1] during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gained from interviews with citizen witnesses, informants, and defendants, whose reliability is established separately herein.

4. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

5. This affidavit is submitted in support of a criminal complaint and arrest warrants for the individuals listed below for committing a violation of Title 21, United States Code Sections 841(a)(1), 841(b)(1)(a), and 846 (conspiracy to possess with the intent to distribute and distribute in excess of 5 kilograms of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance.

---

[1] Throughout this affidavit, reference will be made to case agents. In this affidavit, case agents means those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

## II. INDIVIDUALS FOR WHICH A CRIMINAL COMPLAINT AND ARREST WARRANTS ARE SOUGHT

6. This affidavit is submitted in support of criminal complaint and arrest warrants for the following individuals:

- **Mark A. Cubie**, a.k.a. Old School (B/M, DOB: 10/9/65) - believed to be the organizer/leader of the targeted cocaine and marijuana trafficking organization and the primary user of **target telephone** #1;

- **Orlandes Nickson**, a.k.a. Lando (B/M, DOB: 2/16/71) - believed to be Mark Cubie's partner and/or close associate in the targeted drug trafficking organization and the primary user of **target telephone** #2;

- **Ronald Q. Terry**, a.k.a. Q (B/M, DOB: 4/29/75) - believed to be the first cousin of Orlandes Nickson and a close drug trafficking associate of both Nickson and Mark Cubie;

- **Anthony L. Burke**, a.k.a. T or Tone (B/M, DOB: 9/19/72) - rents vehicles for Cubie and is believed to be a distributor for Cubie;

- **Delano Hill** (B/M, DOB:6/28/73) - believed to be a distributor for Cubie and associated with an address believed to be a stash house for the organization;

- **Edward Cubie** (B/M, DOB: 4/1/71) - brother of Mark Cubie and regular distributor of cocaine for Mark Cubie;

- **Sylvester Pigram**, a.k.a. June (B/M, DOB: 5/4/62) - court-authorized monitoring to date has established that Pigram assists Cubie in Cubie's drug trafficking activities by driving Cubie to various locations;

- **Cristela Nicksion** (H/F, DOB: 6/30/74) - wife of Orlandes Nicksion and believed to assist Orlandes in money laundering of the proceeds of his drug trafficking activities; and

- **Machelle Jelks** (F/B, DOB: 1/18/84) - girlfriend of Mark Cubie and believed to assist Cubie in money laundering of drug proceeds and his drug trafficking activities.

7. As detailed below, there is probable cause to believe that the above listed individuals have committed violations of Title 21, United States Code Sections 841(a)(1), 841(b)(1)(a), and 846 (conspiracy to possess with the intent to distribute and distribute in excess of 5 kilograms of a

mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance.

8. Unless otherwise noted, the following information was obtained by your Affiant, other special agents and officers of DEA, MPD, HIDTA, the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), third-party witness interviews, or from other law enforcement officers who conducted additional investigation into the subject matter of this criminal enterprise, all of whom I believe to be truthful and reliable. To the extent that the information was obtained from confidential informants, their reliability is set forth separately herein.

## III. SPECIFIC PROBABLE CAUSE INFORMATION

9. In August 2004, case agents received information from a confidential informant (CI-1) regarding the drug trafficking activities of Orlandes Nicksion, Mark Cubie, and others. I believe that CI-1's information is truthful and reliable because it is consistent with information obtained elsewhere in this investigation and because I and other case agents have been able to corroborate substantial portions of the information through independent investigation.

10. During debriefing interviews, CI-1 said that CI-1 had been buying and selling kilograms of cocaine for the past several years. One of CI-1's cocaine sources was Orlandes Nicksion, a.k.a. Lando. The last telephone number that CI-1 had for Nicksion was (414) 406-0804. Telephone records reveal that (414) 406-0804 is a Nextel cellular telephone number subscribed to by Mrs. Orlandis Nicksion, 1126 S. Peregrine Street, Grove Land, FL

11. CI-1 stated that he met Nicksion through a mutual friend when CI-1 was released from prison in July 2002. CI-1 stated that initially, the mutual friend and CI-1 convinced Nicksion to begin selling cocaine. Later, Nicksion began selling cocaine with Mark Cubie. According to CI-

1, Cubie's sources of supply are Mexicans from Chicago with whom Cubie is connected through Cubie's uncle, who lives in the Chicago area.

12. CI-1 has not purchased cocaine from Nicksion since Summer 2003. Prior to that time, CI-1 received approximately 30 kilograms of cocaine from Nicksion. CI-1 stated that Nicksion delivered 1-2 kilograms of cocaine at a time to CI-1, after arranging for the transactions via Nicksion's cellular telephone, (414) 406-0804. Nicksion typically delivered cocaine to CI-1 on a "front," meaning CI-1 would pay Nicksion on a later date.

13. In Summer 2003, CI-1 owed to Nicksion $40,000.00 for cocaine that Nicksion previously fronted to CI-1. In July 2004, while talking to Nicksion on the telephone, the police pulled CI-1 over for an improper registration violation. CI-1 was told by the police that there was a warrant for CI-1's arrest. The police seized $9,000.00 that was in the glove box of CI-1's vehicle. CI-1 later lied to Nicksion, telling him that the police seized all of the $40,000.00 that CI-1 owed Nicksion.

14. In early 2005, case agents developed another confidential informant (CI-2) who had direct knowledge of the drug trafficking activities of CI-3, below, and a person CI-2 knew as "Old School." CI-2 later identified a photograph of Mark A. Cubie (DOB: 10/9/65) as the person CI-2 knows as "Old School." I believe CI-2's information is truthful and reliable because it is consistent with information obtained elsewhere in this investigation and because case agents have been able to corroborate substantial portions of CI-2's information through independent investigation.

15. According to CI-2, CI-2 bought large amounts of cocaine from CI-3 during 2004. CI-2 knew that CI-3's source of cocaine was Cubie because CI-2 was present with CI-3 on 10-15 occasions when Cubie delivered cocaine to CI-3. CI-2 knew that Cubie "fronted" large quantities

of cocaine to CI-3 and CI-3 typically paid Cubie back within a couple days. CI-2 stated that during most of the deals, Cubie arrived driving a mid-1990s green Cadillac Eldorado, and would have the drugs in the trunk or in the front seat with him. On one occasion, CI-2 recalled that Cubie arrived at a deal driving a rental Dodge Caravan. CI-2 knew the vehicle was a rental because Cubie told CI-2 and CI-3 that the vehicle was a rental and Cubie said he had a hook-up at the rental place.

16. CI-2 stated that during all of the deals that CI-2 observed between Cubie and CI-3, Cubie was in a vehicle alone. CI-2 stated that CI-3 contacted Cubie on CI-3's cellular telephones, which had telephone numbers (414) 915-9373, and before that, (414) 915-7401. CI-2 stated that (414) 915-9373 is listed in CI-3's girlfriends name. Telephone records confirmed that (414) 915-9373 was listed in CI-3's girlfriend's name and, as further detailed below, (414) 915-9373 has had dozens of contacts with Cubie's known telephone numbers.

17. CI-2 stated that Cubie frequently goes to a girlfriend's house located in the 2500 or 2600 Block of N. 45th Street (Bessie Perry lives at 2861 N. 45th Street). CI-2 further related that during the deals that CI-2 witnessed between CI-3 and Cubie, Cubie always brought the cocaine in 4 ½ ounce quantities separately packaged in clear plastic ziplock bags. The 4½ ounce bags were usually contained within another container which was inside a brown paper bag. CI-2 said that he has seen Cubie deliver cocaine to CI-3 since September 2004.

18. In December 2004/January 2005, through the cooperating efforts of CI-2, case agents developed another confidential informant (CI-3) who had direct knowledge of Cubie's drug trafficking activities. When interviewed by case agents, CI-3 indicated that CI-3 had purchased a large amount of cocaine from a person known to CI-3 as "Old School." CI-3 later identified a photograph of Mark A. Cubie as the person CI-3 knows as "Old School." I believe that the

information CI-3 has provided to case agents throughout this investigation is truthful and reliable because it is consistent with information obtained elsewhere in this investigation and because I and other case agents have been able to corroborate substantial portions of CI-3's information through independent investigation.

19. During debriefings during the end of January 2005, CI-3 stated that Cubie drove a green, two-door Cadillac and used cellular telephone number of (414) 213-5072. CI-3 said that CI-3 met Cubie in August or September 2004. CI-3 had been buying ½ kilogram amounts of cocaine from Cubie for the past several months, estimating that CI-3 had purchased 1½ - 2 kilograms of cocaine per week for the last couple months from Cubie. Cubie typically fronted the cocaine to CI-3 and CI-3 presently owed Cubie $10,000. CI-3 normally called (414) 213-5072 to set up each deal with Cubie. CI-3 stated that Cubie often used either a dark-colored two-door Cadillac or a rental vehicle during the transactions. CI-3 stated that CI-3 does not know where Cubie lives, but that Cubie has a girlfriend who lives in the area of 45th and Locust Streets, Milwaukee. Telephone records indicate that (414) 213-5072 was a Sprint Spectrum pre-paid cellular telephone with no subscriber name or address listed.

20. On January 26, 2005, under the direction and control of case agents, CI-3 made a recorded telephone call to Cubie at (414) 213-5072. During the conversation, Cubie told CI-3 that he would have cocaine for CI-3 to purchase within the next couple of days.

21. On January 28, 2005, at 12:00 p.m., under the direction and control of case agents, CI-3 made a recorded call to Cubie at (414) 213-5072 to arrange a one-half kilogram purchase of cocaine. During the conversation, Cubie and CI-3 agreed to meet later in the day at the Orient

Express Restaurant located at 5040 W. Burleigh, Milwaukee, WI. After the telephone conversation, the following events took place:

- At 1:20 p.m., under the direction and control of case agents, CI-3 made a controlled purchase[2] of one-half kilogram of cocaine from Cubie for $12,000.00. CI-3 met Cubie in the vicinity of N. 51st Street and W. Burleigh. Cubie drove a rental car to the meeting. CI-3 paid Cubie $4,000 in recorded buy money and Cubie gave CI-3 a one-half kilogram of cocaine contained in a blue transparent plastic grocery bag. Cubie agreed to let CI-3 pay the remaining $8,000 at a later date. Cubie rented the vehicle for the period January 13-31, 2005, using 3253 N. 20th Street, Milwaukee, WI as his address on the rental agreement.

- After the transaction, CI-3 met case agents at a pre-determined location and provided the ½ kilogram of cocaine to case agents. The cocaine was divided into four 4 ½ ounce quantities, with each amount in a separate clear plastic ziplock bag. The four plastic bags containing the cocaine were contained within two blue transparent plastic grocery bags. A sample of the cocaine field tested positive for the presence of cocaine.

- After the transaction, case agents followed Cubie to 5886 N. 37th Street, Milwaukee, WI. Cubie and Buchanan exited the vehicle, Cubie opened the trunk of the vehicle, and then both Cubie and Buchanan went into 5886 N. 37th St. After about 17 minutes, Cubie exited the residence, went to the trunk of the rental car, and pulled out a blue transparent plastic grocery bag, similar to the bag that Cubie earlier had given CI-3. Cubie closed the trunk and went back into the residence. As Cubie walked from the vehicle, case agents observed what appeared to be the outline of a kilogram of cocaine through the blue transparent plastic grocery bag Cubie was carrying into the residence.

- Utility and bank records indicate that Delano Hill resides at 5886 N. 37th St., Milwaukee, WI. Telephone records indicate that a number subscribed to Hill at 2826 W. Juneau Ave., is in frequent contact with numbers associated with Mark Cubie. MPD records indicate that Robertson has a tattoo on her neck with the name "Delano" on it.

- At 3:19 p.m., MPD uniformed officers stopped Cubie's vehicle for a traffic violation. The officers identified the driver as Mark A. Cubie (DOB: 10/9/65). Cubie gave an address of 3253 N. 20th Street and displayed a valid Wisconsin driver's license with the same address.

---

3. A "controlled purchase" is a law enforcement operation in which an informant purchases narcotics from a target. The operation is conducted using surveillance, usually audio and videotaping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

The passenger was identified as Donald Buchanan (DOB: 9/15/63). The officers subsequently released Cubie, Buchanan, and the rental vehicle.

- Case agents then followed Cubie to a private parking structure under 5634 W. Oklahoma Avenue, Milwaukee. Case agents learned from the apartment manager there that Cubie lives in Apartment 124 and is assigned parking space #111. The manager took a case agent to parking space # 111 and the case agent observed a dark green-colored 1994 Cadillac Eldorado, vehicle identification number (VIN) 1G6EL12Y7RU601064, bearing Wisconsin license plate # 445-FPA. Wisconsin Department of Transportation (DOT) records reveal that this vehicle is listed to Mark A. Cubie at 3253 N 20th Street, Apartment 2A, Milwaukee.

22. On January 31, 2005, under the direction and control of case agents, CI-3 made a recorded telephone call to Cubie at telephone number (414) 213-5072. During the conversation, Cubie stated that within the next several days he planned to travel to Chicago, IL to obtain additional amounts of cocaine from his supplier.

23. On February 1, 2005, case agents retrieved the garbage from the residence at 5886 A N. 37th Street (the address where, on January 28, 2005, agents observed Buchanan and Cubie, with Cubie carrying the blue transparent plastic bag) From a green garbage container found directly behind the garage of the residence in the alley, case agents recovered the following items:

- an empty cardboard box for a Diablo brand digital mini scale;
- an empty box of Arm & Hammer brand baking soda;
- an empty box of clear plastic sandwich bags; and
- approximately 100 empty clear plastic sandwich bags with the corners of the bags cut off and containing cocaine residue inside of the bags.

24. A sample of the residue found in the bags tested positive for the presence of cocaine salt. Based on my training and experience, I believe that all of the above items, especially considered together, are being used in the packaging and distribution of drugs. Case agents have also discovered that the residence located at 5886 A N. 37th Street is leased to Katie Payne.

25. Case agents contacted Enterprise Rental Car and inquired about Cubie and the rental cars observed during surveillance. Records revealed that a 2005 Dodge pick-up truck was rented by Anthony and Jenny Burke, 1008 E. Waterford, Milwaukee, WI, from January 22, 2005 to February 10, 2005. Mark Cubie was listed on the application as an additional driver. The truck was turned in on February 10, 2005, and the Burkes rented a tan 2005 Chevrolet Ventura van, bearing Wisconsin plate number 344-GZU. The rental agreement for that van also listed Mark Cubie as an alternate driver. That van was turned in on March 24, 2005.

26. On February 2, 2005, under the direction and control of case agents, CI-3called Cubie at telephone number (414) 213-5072 and arranged to pay Cubie money toward CI-3's drug debt. That afternoon, under the direction and control of case agents, CI-3 met with Cubie and paid Cubie $5,000.00 in recorded buy money. During the recorded meeting, Cubie told CI-3 that he would have more cocaine within a couple days and that he expected CI-3 to pay the remainder of CI-3's drug debt at that time. Case agents conducting surveillance of the meeting observed Cubie arrive in the above-described dark green Cadillac.

27. After the meeting, case agents observed Cubie make several short stops at residences and businesses on the north side of Milwaukee. During some of the stops, Cubie was seen meeting with unidentified individuals. It appeared to me, based upon my training and experience, that Cubie was likely trying to collect other drug debts. The following events, among others, were documented through physical and electronic surveillance:

- Cubie's first stop was at a residence at 2945 N. 53rd Street, Milwaukee, WI. At 3:00 p.m., Cubie exited the residence carrying a blue transparent plastic grocery bag. Cubie entered the green Cadillac and placed the bag in the front seat area. Case agents then observed Cubie fidgeting in the vehicle as if he was hiding the bag. Public records list this address as one that Jan Long and Robert Bridges reside. Telephone records also show numerous contacts

between numbers subscribed to by Jan Long and Robert Bridges and telephones used by Mark Cubie and Orlandes Nicksion;

- Cubie eventually went to the post office, 6501 W. Fond du Lac Avenue, Milwaukee, WI. Case agents positioned inside observed Cubie writing out mailing labels for packages. Cubie addressed one of the labels to "Cristela Nicksion, 1126 Peregrine Street, Grove Land, FL, 34736," with telephone number "414-406-0873." At 4:28 p.m., Cubie exited the Post Office and drove to several other locations. Telephone records reveal that (414) 406-0873 is a Nextel cellular telephone number subscribed to Mrs. Orlandis Nicksion, 1126 S. Peregrine Street, Grove Land, FL.

- After Cubie left the post office, he was observed meeting with an individual and conduct what appeared to be a drug transaction. After the transaction, as Cubie drove away, MPD officers pulled over his car. The driver was identified as Mark A. Cubie and the passenger was identified as Donald Buchanan (DOB: 9/15/63). Cubie gave consent to the officers to search the Cadillac. During the search, officers located a loaded black Beretta .22 caliber semi-automatic firearm, bearing serial # C69868, in the center console between the front driver's seat and the front passenger's seat. Officers also found a black leather briefcase on the back seat which contained approximately 100 grams of marijuana in a clear plastic ziplock bag, approximately 11 grams of cocaine in a clear plastic ziplock bag, approximately 35 grams of a crack cocaine in a clear plastic ziplock bag, and approximately $2,094.00 U.S. currency. The officers also found approximately $4,400.00 U.S. currency wrapped in a white plastic grocery bag under the front driver's seat, consistent with the observations of case agents while Cubie and Buchanan were at 4116 North 67th Street. Cubie and Buchanan were arrested and the vehicle was seized.

- Cubie was advised of his constitutional rights, indicated that he understood them, and agreed to make a statement. Cubie told case agents that he lived at 3253 N. 20th Street, Milwaukee, WI. He stated that he has a girlfriend, Bessie Perry, who lives in the area of N. 45th Street and Locust and has telephone number (414) 873-8270. Cubie admitted to meeting with the Hispanic male in the parking lot of the Burger King. When asked if the meeting was a drug transaction, Cubie declined to answer. Cubie stated that he did not know the Hispanic male's name. When asked if his fingerprints would be on the drugs found in the brief case in his Cadillac, Cubie answered "they shouldn't be." When asked whose gun was in the center console, Cubie relied "Well if big man ain't going to do the right thing, I don't know." Cubie also said that the cash in the car was money that he earned from selling clothes. Cubie said that he buys clothes in New York, brings them to Milwaukee, and sells them at beauty salons and residences. He stated that he also sells the clothes out of the trunk of his car.

- A records check revealed that Cubie was convicted of Delivery of a Controlled Substance in Cook County, IL, on January 15, 1992. He was sentenced to four years' imprisonment.

- While Cubie's 1994 Cadillac Eldorado was in police custody, case agents attached an electronic surveillance device to the vehicle. The device enables case agents to monitor the approximate location of the vehicle. Case agents received a 60 day court authorization to monitor the device. A 60 day extension to monitor the device was granted by the court.

28. Cubie was released from custody on February 4, 2005, without charges being filed. The Cadillac, with the GPS device covertly attached to the vehicle, was released to Cubie's custody.

29. Since February 4, 2005, data from the GPS device and case agent physical surveillance indicates that Cubie and the vehicle has frequently traveled to the following addresses:

- 5634 W. Oklahoma Avenue, Milwaukee, WI (Cubie's apartment building);
- 2861 N. 45th Street, Milwaukee, WI (Bessie Perry/Mad Merchandise);
- 3253 N. 20th Street, Milwaukee, WI (address Cubie used with police);
- 4400 W. Arthur Court, Milwaukee, WI (Michelle Jelks' apartment building);
- 3809 N. 25th Street, Milwaukee, WI (possible stash house);
- 3867 N. 24th Place, Milwaukee, WI (possible stash house);
- 2756 N. 47th Street, Milwaukee, WI (possible stash house for Cubie);
- 5533 W. National Avenue, Milwaukee, WI (Edward Cubie's apartment building);
- 4116 N. 67th Street, Milwaukee, WI (Buchanan's girlfriend);
- 5886A N. 37th St., Milwaukee, WI (Delano Hill's residence, packaging material in garbage);
- 2945 N. 53rd Street, Milwaukee, WI (Robert Bridges listed on Exp. Mail Pkg.);
- 8666 S. Chicago Drive, Apt 13, Oak Creek, Wisconsin (Nicksion's residence).

30. According to information provided by the landlord at 4400 W. Arthur Court, Apt. 2 is rented to Michelle Jelks (DOB: 1/18/84). According to CI-3, Jelks is Cubie's girlfriend. On her application to rent, Jelks listed Mark Cubie as her boyfriend and as a reference.

31. Cubie gave MPD officers the address of 3253 N. 20th Street, Apartment 2A, when he was arrested on February 2, 2005. It is also the address listed on Cubie's State of Wisconsin driver's license and on Wisconsin DOT records for the green Cadillac.

32. After his arrest on February 2, 2005, Cubie stated that his girlfriend, Bessie Perry, lives at 2861 N. 45th Street. The land line telephone at 2861 N. 45th Street is (414) 873-8270 and lists to B.J. Perry. Public records also indicate that 2861 N. 45th Street is the residence of Bessie Perry.

33. When Cubie was arrested February 2, 2005, he was in possession of a cellular telephone assigned number (414) 745-5056 (the same number listed under the name "Marco" in the directory of Santoya's cellular telephone that day). The subscriber for (414) 745-5056 is listed as "Mad Merchandise," 2861 N. 45th Street. A search of Cubie's wallet revealed a Wisconsin Seller's Permit #717520-A, with the name Mark Cubie and the business name "Mad Merchandise."

34. As indicated above, on February 2, 2005, Cubie was observed going to the Post office located at 6501 W. Fond Du Lac Ave. Once inside he was observed addressing an express mail envelope to Cristela Nicksion, 1126 Peregrine St, Groveland, FL 34736, (414) 406-0873. A check of the envelope with the United States Postal Inspector revealed that the return address was marked: Robert Walker, 3253 N. 20th St. Milwaukee, Wisconsin, 53206. A check with the money order portion of the Post Office revealed that Cubie had given cash and purchased 2 separate $1,000.00 money orders prior to mailing the envelope to Florida.

35. A Postal Inspector obtained copies of two money orders, for $800 and $1000, purchased by Cubie on January 25, 2005. On the same day, Cubie sent an express mail envelope to Cristela Nicksion in Florida and used the return address of Mark Anthony, 3253 N. 20th St., (414) 873-8270 (the telephone for Bessie Perry at 2861 N. 45th St).

36. Public and mortgage records indicate that 8666 S. Chicago Drive, Apt 13, Oak Creek, WI, is associated with Cristela and Orlandes Nicksion, who are married. The utilities at 8666 S. Chicago, Apt. 13, are listed under the name Christina Gonzales, and have been so since February 1999. Public records indicate that Cristina Gonzales is the sister of Cristela Nicksion (nee Gonzales).

37. Telephone records reveal that Cubie changed his cellular telephone number from (414) 213-5072 to (414) 460-1716, and then to (414) 460-5638.

38. On March 13, 2005, at approximately 2:10 p.m., telephone records revealed that (414) 460-1716 received a call from (414) 406-0804, but the call did not connect. A few minutes later, (414) 460-1716 called (414) 406-0804 and a ten minute call took place. Information received by confidential informants and telephone records indicate that (414) 406-0804 is a cellular telephone used by Cubie's partner in drug distribution, Orlandes Nickson.

39. On March 15, 2005, case agents conducting surveillance observed Mark Cubie meet with Delano Hill who was driving a Ford Explorer bearing WI plate 214-5002. WDOT records indicate that the Explorer is a rental vehicle and rental records show that the Explorer was rented by Teresa Robinson (an alias for Tamisha Robertson, Hill's girlfriend) using 5886 N. 37th Street (believed stash house) as her residence.

40. Case agents conducting surveillance on March 22, 2005, at approximately 8:10 a.m., observed a medium blue 1998 Buick Regal LS 4-door, bearing Wisconsin plate number 447-GNC, parked in the parking lot at 8666 S. Chicago Rd., Oak Creek. WDOT records indicate that the plate number lists to Orlandes Nicksion (DOB: 2-16-71) at 4183 N. 15th Street, Milwaukee, WI.

41. Telephone records reveal that (414) 460-1716 was operating in the Chicago, Illinois area at 3:45 p.m. on March 28, 2005. Surveillance of Cubie's Cadillac revealed that the vehicle remained in the Milwaukee area while target telephone #1 was operating in Chicago. Telephone records also revealed that on March 28, 2005, Nicksion's cellular telephone was operating in the Chicago, Illinois area at 12:07 p.m. and then back in the Milwaukee area at 5:07 p.m.

42. On March 30, 2005, case agents conducting physical and electronic surveillance observed and noted the following events:

- At 1:00 p.m., Cubie's Cadillac was parked at Orlandes Nicksion's residence, 8666 S. Chicago Drive, Apt. 13, Oak Creek, WI. Orlandes Nicksion's light blue, 1998 Buick Regal was also parked at the same location. Telephone records indicated that at the time, both Cubie's cellular telephone, (414) 460-1716, and Nicksion's cellular telephone, (414) 406-0804, were operating in the Chicago area.

- Records from Dollar Rent-A-Car revealed that Mark A. Cubie rented a light blue, 2005 Dodge Caravan bearing Florida plate number W70-HQN on February 25, 2005, and was scheduled to return it on March 30, 2005, at approximately 7 p.m. At 3:55 p.m., case agents observed that van pull into the parking lot of 8666 S. Chicago Drive and park approximately 10 feet from the door to Nicksion's apartment, Apt. 13.

- Case agents observed Nicksion exit the driver's side of the van and Cubie exit the passenger's side. Cubie walked into Apt. 13 carrying a black leather briefcase, similar to the one he had on February 2, 2005 and as seen in other surveillance prior to this date.

- A short time later, Cubie exited the apartment and opened the back of the van. Cubie then retrieved a large dark blue duffle bag that appeared to the case agents to 3-4 feet in length and 18 inches in diameter. Case agents observed Cubie carry the duffle bag, hanging in front of him and using two hands and his knee, to the rear of Nicksion's Buick Regal parked nearby. Based on the case agents' observations and Cubie's actions, it appeared to the case agents that the duffle bag was full and heavy.

- Cubie opened the trunk of the Buick Regal and then opened the duffle bag on the ground. Cubie appeared to be moving items around in the duffle bag. He then took some of the items out of the duffle bag and placed them in the tire well, under the spare tire, in the trunk of the Buick Regal. Cubie then placed the whole duffle bag in the trunk and closed the trunk.

- At 4:43 p.m., Cubie parked the Buick Regal in front of 3867 N. 24th Place and a black male about 5'9" and medium build, wearing a base ball cap, exited 3867 N. 24th Place and met Cubie at the trunk of the Buick Regal. Cubie opened the trunk, retrieved the above-described blue duffle bag, and walked with it towards the side door at 3867 N. 24th Place. Case agents observed that Cubie was having a hard time carrying it, as if it was heavy.

- At 4:57 p.m., Cubie returned to the Buick Regal and another black male carried an unknown item wrapped in a white plastic bag into the residence. Cubie entered the vehicle and drove from the area.

- Case agents followed Cubie to an Office Max store in the area. At 5:20 p.m., Cubie exited the store carrying a shopping bag. He walked to the Buick Regal, dropped the bag inside the car, and then walked to a Walgreen's store located in the same parking lot.

- At 5:27 p.m., Cubie exited the Walgreen's store , entered the Buick Regal, and then drove through a McDonald's drive-through. Cubie left McDonald's at 5:45 p.m. and drove to the vicinity of the 3900 Block of N. 9th Street and N. 10th Street. Surveillance was terminated for fear that Cubie would spot law enforcement.

- Case agents went back the Office Max store and determined that Cubie had just purchased an electronic Pelouze Postal scale, Model SP5, which weighs items from one gram to 5 pounds. The scale cost $32.97. Case agents obtained a copy of the register receipt for the transaction, as well a video tape showing Cubie purchasing the scale.

43. On March 31, 2005, case agents conducting surveillance at Orlandes Nicksion's residence in Oak Creek observed Nicksion's light blue Buick Regal in the parking lot. Also in the parking lot at the same time was a blue, rental 2005 Dodge mini van bearing Florida plate # W70HQN. Records revealed that Cubie rented the van on March 25, 2005.

44. On April 22, 2005, case agents received information and records from Guardian Credit Union located at 4501 W. Greenfield Avenue, West Milwaukee, WI. The records revealed that Mark A. Cubie rented a safe deposit box, #19, on February 7, 2005. Bank tellers that dealt with Cubie on that day indicated that Cubie asked the tellers several questions as to whether the IRS or other government agencies would have access to the safe deposit box. Cubie also asked whether his mother would have access to the safe deposit box in the event that something happened to Cubie. Cubie was informed that his mother would have access to the box. Cubie did not put anything in the box at that time. The records indicate that Cubie has accessed the box one time since February 7, but the date of the access was not noted. It is believed that Cubie deposited things of value in the safe deposit box at that time. The records further reveal that Cubie routinely deposits cash into his

credit card account. Cubie always ends his account balance in an even number with out any cents. The tellers have noticed that Cubie is slow and methodical at the bank.

45. On April 25, 2005, the Honorable Rudolph T. Randa, Chief United States District Judge for the Eastern District of Wisconsin, signed an order authorizing the interception of wire communications to and from cellular telephone number (414) 460-5638 for a period of 30 days. Monitoring of (414) 460-5638 began on April 26, 2005 at approximately 9:30 a.m.

46. To date, the monitoring of target telephone #1 has confirmed that: Mark A. Cubie is the primary user of target telephone #1; Orlandes Nicksion is the primary user of target telephone #2, (414) 406-0804; and Jose G. Lopez is the primary user of target telephone #3, (773) 416-2111. As indicated below, monitoring to date of target telephone #1 has also revealed that Cubie, Nicksion, and Lopez continue to use the target telephones to commit the aforementioned criminal offenses. Between April 26, 2005, and May 15, 2005, court-authorized monitoring of conversations over target telephone #1 and physical surveillance has revealed dozens of calls relevant to the aforementioned offenses under investigation and Cubie, Nicksion, Lopez, and others committing those offenses.

47. On April 26, 2005, monitoring of target telephone #1 and surveillance of Cubie established that Cubie was trying to meet with his supply, Jose Lopez, in Chicago, Illinois in order to pay Lopez money for a past drug deal and to obtain additional amounts of cocaine. During the course of the day, Cubie had several conversations with Nicksion over target telephone #2 and Lopez over target telephone #3 regarding Cubie's desire to meet with Lopez to pay money and obtain drugs. For example:

- At 2:50 p.m., target telephone #1 received a call from target telephone #2, (414) 406-0804 (Nicksion). Cubie told Nicksion that he tried to meet with Lopez the night before but that things did not turn out right. Cubie told Nicksion that Lopez was telling him that things

looked good and told Cubie not to leave. Cubie said that he left anyway because it did not look right. Nickson asked if Cubie still had the "receipts" (money). Cubie said he needs them for his uncle Fred, so Cubie can take his little trip. Cubie tells Nicksion that when he gets back they will "chop it up then." Cubie said "bottom line, a mother fucker needs some dope."

- 5:49 p.m., target telephone #1 called target telephone #2 (Nicksion). Cubie asked Nicksion if Nicksion was still in Chicago. Nicksion said yes and that he would be there for a while. Cubie told him that "his man" (Lopez) just called him and that he's supposed to be meeting him "over there" (Chicago). Cubie said that he needs a designated driver (courier) to make the trip with Cubie to Chicago. Nicksion told Cubie that he could not help because he was stuck with his girl.

- At 7:51 p.m., surveillance observed Cubie driving a rented Dodge van and exit I-90/94 at the Grand Avenue exit in Gurnee Mills, Illinois. Cubie drove into the parking lot at the Gurnee Mills shopping center and parked the rented Dodge van near the Chili's Restaurant. Cubie entered the restaurant and sat at the bar next to an Hispanic male that case agents subsequently identified as Jose G. Lopez.

- Case agents maintained surveillance on the rented Dodge and later observed Lopez standing next to the van when a dark colored Chevrolet Tahoe being driven by an unidentified individual pulled up next to Lopez. Lopez retrieved a small white bag (estimated to be the size of a kilogram of cocaine) from the right rear passenger side of the Tahoe. Once Lopez obtained the bag from the Tahoe, he entered the rented Dodge van by the rear passenger side sliding door and placed the bag inside the van. Lopez then returned to the restaurant and the Tahoe departed the area

- At 9:52 p.m., target telephone #1 received a call from target telephone #2 (Nicksion). Cubie and Nicksion talked about Cubie's meeting earlier in the evening with Lopez. Cubie complained about the quality of drugs that he got from Lopez. Cubie asked whether Nicksion would need one or two (kilograms) and Nicksion said whatever he could get. Cubie then told Nicksion that Cubie would try to hold on to it (drugs) for him. Nicksion replied that Cubie might as well. Nicksion told Cubie that he wouldn't be surprised if he needed it by tomorrow. Nicksion then asked "How did he (Lopez) even look at you, Mark?" Cubie told Nicksion that Lopez didn't. Cubie told Nicksion that Lopez was talking about an old mess as an excuse for the hassles that Cubie put up with.

48. On April 27, 2005, monitoring of target telephone #1 and surveillance of Cubie established that Cubie spent the day collecting money from persons that he distributed drugs to during the past several days and was planning a trip to New York City on Thursday, April 28, 2005.

Cubie also made arrangements for Nicksion to manage Cubie's drug trafficking activities while Cubie was in New York City. For example:

- At 1:17 p.m., target telephone #1 received a call from (773) 471-0209 (Sylvester Pigram, a.k.a. June). During the call, June asked Cubie what he needs to do. Cubie told him that Cubie did it already. June asked Cubie if there anything he else could do. Cubie told June that he has to wait until Cubie comes back. Cubie told June that Cubie did not get a whole lot (cocaine) anyway. Cubie then clicked to another line and another male asked Cubie if Cubie was ready. Cubie replied that he was ready.

- 1:41 p.m., target telephone #1 received a call from (441) 460-5909 (Ronald Q. Terry). Cubie told Q that he's about to make a stop over there. Q told Cubie that he (Q) is about to make a move right now (drug deal). Cubie told Q that he will be there in 30 minutes.

- 1:50 p.m., target telephone #1 received a call from (414) 649-9679 (Edward Cubie). Cubie asked Edward if Edward wanted an 11 or a 21 jersey (½ kilogram of 1 kilogram of cocaine). Edward told Cubie that he needs them both. Cubie told Edward that he will call him back.

- 3:44 p.m., target telephone #1 received a call from (414) 649-9679 (Edward Cubie). Cubie asked Edward Cubie if he needed a "Isiah Thomas" jersey or "Michael Brady" jersey. Edward said he wants a "21 Jersey" and Cubie said he had it. Edward said he needed a "Isiah Thomas" and "Dominique Wilkins". Cubie told him that "that's two altogether." (2 kilograms of cocaine) Edward asked Cubie how long it is going to be because Edward had people coming in who are on they're way. Cubie told Edward that he is on his way to meet with Edward.

- At 4:07 p.m., target telephone #1 called target telephone #2 (Nicksion). Cubie asked Nicksion how the outfits were moving. Nicksion said that the female was moving them slowly but surely and said that he was going back over to "Q's" (Ronald Q. Terry) house to "wrap that shit (cocaine) up." Cubie said they need to "chop" it (mix the cocaine) up.

- At 4:30 p.m., surveillance observed a black Cadillac STS bearing WI plate 275-HTC arrive at Cubie's apartment building, 5634 W. Oklahoma Avenue. WDOT records reveal that the Cadillac STS is registered to Jennifer Burke at 1008 E. Waterford Avenue. Anthony Burke and Mark Cubie exited the Cadillac STS and entered the building. Cubie was carrying the same black brief case that had cocaine, crack, marijuana, and cash in it when Cubie was arrested on February 2, 2005.

- 11:45 p.m., target telephone #1 called (414) 412-5261. Cubie and an unidentified male (UM) talked about Cubie going to New York City. Cubie said he was calling about the other thing. The UM said the money I owe you and Cubie replied yes. The UM said as soon as he gets some more work (cocaine). Cubie said that he will have something (cocaine) next week

when he gets back. Cubie said that Orlando (Orlandes Nickson) is going to relieve Cubie while Cubie is out of town. UM said its about time Nicksion relieves Cubie. The UM asked whether Nicksion would be handling everything and Cubie said yes. The UM then asked when Nicksion planned to leave Milwaukee and Cubie said in a couple of weeks. The UM asked who would be taking over when Nicksion leaves and Cubie said that they would put something together then.

49. From April 28-30, 2005, monitoring and surveillance established that Mark Cubie and Ronald Q. Terry were in New York City. There was relatively little contact between Cubie over target telephone #1 and Nicksion at target telephone #2 and Lopez at target telephone #3.

50. On April 28, 2005, at approximately 4:55 p.m., case agents conducting surveillance in the area of 6th St. and W. Puetz Rd. observed Orlandes Nicksion driving his 1998 Buick Regal. Nicksion drove to the Oak Creek Self Storage located at 611 W. Puetz Rd., Oak Creek, WI. Nicksion was in the car by himself and was observed by storage unites #62 and #63. Nicksion was observed with a lock in his hand, but it could not be determined which unit Nicksion gained access to. Records from the storage facility indicate that storage unit #63 was rented by Cristela Nicksion in September 2003. Cristela Nicksion is the wife of Orlandes Nicksion.

51. On May 1, 2005, monitoring and surveillance established that Cubie returned from New York City and began to collect money for drug debts and arrange a cocaine transaction with Lopez for later in the week. For example:

- At 1:44 p.m., target telephone #1 received a call from target telephone #2 (Nicksion). Cubie then asked Nicksion about the contracts (money owed by persons for drug amounts). Nicksion told Cubie that they are just waiting to receive the money. Cubie asked if Nicksion was still waiting on "C" (Corey Reynolds) and Nicksion replied yes.

- At 2:11 p.m., target telephone #1 called target telephone #3 (Lopez). Lopez told Cubie that he was working at the office and asked if Cubie was going to stop by. Cubie asked Lopez if Lopez had any supplies (cocaine) left and Lopez replied yes and that "they can go to work" (do a deal). Cubie and Lopez agreed to talk at a later time.

- 5:36 p.m., target telephone #1 received a call from (414) 649-9679 (Edward Cubie). Edward told Mark that he was in need of some things and that he ended up going to his other guy and got some (drugs). Cubie was upset and said that he told Edward that he would be back today. Edward said that he was not sure if it was going to be at night. Edward tried calling Mark several times. Mark asked about the other guy and Edward said that the guy is straight. Cubie asked Edward could come through and Edward said he would check on what he had for Mark. Monitoring agents heard Edward counting money in the background. Edward then asked how long Mark would be at Mark's present location and Mark said about another hour. Mark told Edward that he would roll by before going to the house later.

52. On May 2, 2005, monitoring and surveillance established that Cubie was still collecting money and making arrangement with Lopez for a future drug deal. For example:

- At 11:40 a.m., target telephone #1 received a call from target telephone #3 (Lopez). Lopez told Cubie that he had been waiting on Cubie since yesterday. Cubie told Lopez that he probably would not make it down today unless Lopez meets Cubie later on. Lopez said "no problem." Cubie then asked how the material (cocaine) is looking today. Lopez stated "so so." Lopez asked Cubie if Cubie is done (collecting money) and Cubie replied just about. Lopez told Cubie to let him know when Cubie is done. Cubie told Lopez that he has one guy that is trying to finish it up now (distribute the cocaine that Cubie previously gave to him). Lopez told Cubie to call him later and Cubie agreed.

- 4:37 p.m., target telephone #1 called (414) 645-2090 (Edward Cubie) Cubie asked Edward about the money the Edward owes Cubie. Cubie stated that "other" people are waiting on Edward. Edward stated that as soon as his gets the money, Cubie will get it. Edward said that "Kelly" owes the money. Edward stated that he has never "fucked" Cubie over. Cubie said that after he gets his money from Kelly, Cubie is done with Kelly.

- 4:56 p.m., target telephone #1 received a call from (414) 7882908 (Delano Hill). Hill asked Cubie if Cubie was ready yet. Cubie said not right now and to call back in a couple of hours.

- 5:13 p.m., target telephone #1 called target telephone #2 (Nicksion). Nicksion said that he would call Cubie back as soon as Nicksion's guy calls Nicksion back.

- 6:21 p.m., target telephone #1 called (773) 737-9526 (Sylvester Pigram, a.k.a. June). Cubie said that he waiting to get in contact with his guy and that he will call June back when Cubie hears from his guy.

- At 6:25 p.m., target telephone #1 called target telephone #3 (Lopez). Cubie said that he is almost ready (with money) for Lopez. Lopez said that he is almost ready (with cocaine) for Cubie. Lopez said that he has "almost 2" (2 kilograms of cocaine). Cubie said that he will need more than that and Lopez said that he will have Cubie covered.

53. On May 3, 2005, monitoring and surveillance established that Cubie collected most of the money that he owed to Lopez and agreed to meet with Lopez in Chicago to pay Lopez the money and received additional kilograms of cocaine from Lopez. For example:

- At approximately 11:37 a.m., target telephone #1 received a call from target telephone #2 (Nicksion). Nicksion and Cubie talked about how Nicksion was still short on gathering money for Cubie. Cubie said "Oh, man, you're putting me behind the eightball." Cubie said that Nicksion should have kept all that then. Cubie said that he has been ready since 10:30 a.m. (to go meet Lopez in Chicago) and that he has been waiting on Nicksion. Nicksion said that he would call Cubie back.

- At 12:25 p.m., surveillance observed a silver Chrysler Sebring bearing IL plate 5125582 and being driven by Machelle Jelks arrive at Cubie's residence. Cubie entered the vehicle and placed a black leather briefcase (the same type as previously seen on surveillance) and a black plastic bag on the back seat of the vehicle. The vehicle then left the area, driving east bound on W. Oklahoma Avenue. IDOT records revealed that the above Chrysler Sebring is a rental car belonging to Dollar Rent A Car. Rental car records further revealed that Mark Cubie rented the Sebring from Dollar at Mitchell International Airport a few days before.

- At 2:00 p.m., target telephone #1 received a call from target telephone #3 (Lopez). Cubie asked Lopez if Lopez was ready ( to receive money and supply cocaine) for Cubie. Lopez asked Cubie what time Cubie would be down in Chicago. Cubie said a couple hours and that he would be leaving in 30-40 minutes. Lopez asked if Cubie has everything (money) and Cubie replied that he is a little short, but has the majority of it. Lopez told Cubie that someone is "busting his balls" and Cubie replied that he will have to catch Lopez on the weekend on that (the remainder of the money owed to Lopez). Cubie told Lopez that he was going to have to bring one of them back (bad kilogram of cocaine). Lopez told Curie that he is working on it very hard and that Cubie would be fine.

- At 2:45 p.m., target telephone #1 called target telephone #2 (Nicksion). Cubie told Nicksion that "that one only had 28 dollars" ($28,000) Cubie said that he was looking in the bag and one of them is 28 ($28,000). Nicksion said that he got that one from Q (Ronald Q. Terry). Cubie told Nicksion "you and me didn't count it." Nicksion said that Q is going to say that the amount is what Q owes Nicksion, whatever the amount is. Cubie then said "all right, it will just be 12" ($12,000) Cubie said that he is going to head for Chicago.

- 7:41 p.m., target telephone #1 called target telephone #3 (Lopez). Cubie told Lopez that he can bring it downstairs, he's outside Lopez' office (Cubie delivered drug debt money to Lopez at 1675 N. Western Avenue, Chicago).

- 8:24 p.m., target telephone #1 called (773) 470-8348 (Sylvester Pigram). Cubie told June to make sure that June puts his seatbelt on. (June is following Cubie with the drugs) June said okay.

- 8:35 p.m., target telephone #1 called (773) 470-8348 (Sylvester Pigram). June asked Cubie where Cubie was at and Cubie told June that he just passed June. Cubie told June to just follow the Milwaukee sign. Cubie said that he would call June at the other toll.

- 8:39 p.m., target telephone #1 received a call from (414) 788-2908 (Delano Hill). Cubie told Hill that he would be back around 10-10:30. Cubie told Hill that "he's got him" as soon as Cubie gets back. (Will bring drugs to Hill).

- 8:48 p.m., target telephone #1 called (773) 470-8348 (Sylvester Pigram). Cubie asked June if he knows to "turn up here?" June told Cubie that he was right behind Cubie.

- 9:41 p.m., target telephone #1 received a call from (414) 649-9679 (Edward Cubie). Ed asked if Cubie was back yet and Cubie said no. Cubie asked Ed what he wanted and Ed told Cubie that he wants a 21 jersey (1 kilogram) and tomorrow he wants an 11 jersey (½ kilogram) and he also wants one of them green Celtic jogging suits. Cubie told Ed to just tell him when Ed sees him.

- 9:43 p.m., target telephone #1 called (773) 470-8348 (Sylvester Pigram). Cubie asked June if June was behind him and June replied yes.

- 9:44 p.m., the rented Chrysler and the Plymouth Caravan exited I-894 at 60th St. At 9:50 p.m., both vehicles were observed pulling into the underground parking garage at Cubie's apartment building at 5634 W. Oklahoma Avenue.

- 9:50 p.m., target telephone #1 received a call from (414) 460-5909 (Ronald Q. Terry). Cubie told Q that he would be there in 10 minutes.

- 9:54 p.m., the rented Chrysler with two black males as occupants exited the underground parking at Cubie's apartment building. Surveillance followed the vehicle to 2945 N. 53rd St, where it arrived at 10:06 p.m. Once the vehicle parked, Pigram was observed opening the trunk, retrieving a white paper shopping bag with two handles, and walking into 2945 N. 53rd St. with Cubie. Case agents noted that the bag appeared to contain heavy items and weigh approximately 10-12 pounds.

- 10:32 p.m., Cubie left 2945 N. 53rd St. in the rented Chrysler.

- 10:43 p.m., target telephone #1 called (414) 460-5909 (Ronald Q. Terry). Cubie told Q to open the door.

- 10:59 p.m., target telephone #1 called (414) 460-5909 (Ronald Q. Terry). Cubie again talked to Q and told Q to open the door. Case agents saw Cubie arrive at 2945 N. 53rd St. at this time.

- 11:13 p.m., target telephone #1 received a call from (414) 788-2908 (Delano Hill). Cubie asked Hill if Hill is about ready to get en route. Hill told Cubie that he is ready up there. Cubie told Hill to sit tight and that he will be there.

- 11:24 p.m., target telephone #1 called (414) 788-2908 (Delano Hill). Cubie told Hill that he would be there in 5 minutes, that it has just been a couple blocks.

- 11:36 p.m., target telephone #1 called (414) 788-2908 (Delano Hill). Cubie asked if Hill was still there and Hill replied yes. Cubie said okay.

54. On May 4, 2005, monitoring and surveillance established that Cubie delivered money to Lopez the day before and that Cubie received cocaine during the same trip. Monitoring and surveillance also established that Cubie distributed the cocaine that he received from Lopez and was again making arrangements with Lopez to receive additional amounts of cocaine. Eventually, Cubie took money down to Lopez in Chicago and obtained approximately 10-12 kilograms of cocaine. For example:

- At 3:56 p.m., target telephone #1 called target telephone #3 (Lopez). Lopez stated that he was still at the office (1675 N. Western Avenue, Chicago) and that he was still waiting (on word from his source) and that he will call Cubie. Cubie asked how long and Lopez said that he could not tell Cubie because they (source) say one thing and do another. Cubie said okay.

- At 8:23 p.m., target telephone #1 received a call from target telephone #2 (Nicksion). Nicksion stated that Q (Ronald Q. Terry) just called him and told Nicksion that he (Q) would be going to Chicago with Cubie that day. Nicksion told Cubie that it would not be necessary for him (Nicksion) to go on the trip. Nicksion stated "you don't need no parade with you."

- 8:26 p.m., target telephone #1 received a call from (414) 327-7882 (Machelle Jelks). Cubie told Machelle that it does not matter what she looks like. Cubie stated "I ain't got time for that she got to come now with us" (talking about Jelks child). Surveillance later observed Cubie, Jelks, and the child drive to Chicago and eventually meet with Cubie's source.

- At 10:04 p.m., surveillance observed Cubie arrive at the Don Roth Restaurant on Milwaukee Avenue in Wheeling, IL and parked next to Lopez' previously identified Chevy Tahoe.

Cubie then went into the restaurant. At 10:06 p.m., both Cubie and Lopez exited the restaurant and walked to their vehicles. Lopez entered the rear passenger door of his vehicle and retrieved two black back pack-type bags and placed them in the trunk of Cubie's vehicle. Lopez and Cubie then left the area and Cubie proceeded back to Milwaukee. Based the monitoring of target telephone #1 and surveillance, it is believed that Lopez gave 10-12 kilograms of cocaine.

- 10:25 p.m., target telephone #1 called target telephone #3 (Lopez). Lopez asked Cubie how soon Cubie could get the deal going in Milwaukee (distribute the cocaine Cubie just received from Lopez and collect the money) and Cubie said maybe over the weekend. Lopez stated "so we can go in the next deal then," to which Cubie replied, "maybe this weekend."

- 11:57 p.m., target telephone #1 called (414) 534-6156 (Edward Cubie). Mark asked Ed if if he wanted it the same as last time. Ed said that he wants a 11 and a 21 jersey ($11,000 for ½ kilogram and $21,000 for 1 kilogram of cocaine). They discussed how and when to make the delivery. Ed asked Mark if Mark has what he wants and Mark said yes.

55. From May 5-10, 2005, monitoring and surveillance established that Cubie was trying to collect the money owed to Lopez for the drug deal that took place on May 4, 2005. Cubie also began to make arrangements with Lopez and others to obtain an additional amount of cocaine on May 11 or 12, 2005. For example:

- On May 5, 2005, at 7:04 p.m., target telephone #1 called target telephone #3 (Lopez). Lopez asked Cubie how it is looking (the collection of money). Cubie said that it is slow right now, but it will pick up over the weekend. Lopez said that he is going to come see Cubie tomorrow (Friday). Cubie said that he would call Lopez in the morning. Cubie said that he would come see Lopez on Saturday and stated "cause I haven't did very much man." Lopez said not to forget the other one (the money that Cubie was short on for a previous deal) and Cubie said that he would probably have the money for Lopez on Saturday. Cubie then took a call waiting call from target telephone #2 (Nicksion). They talked about doing a drug deal and agreed to meet at Q's house (2945 N. 53rd St.) Cubie asked Nicksion whether Nicksion had talked to "C" yet.

- On May 6, 2005, at 11:55 a.m., target telephone #1 received a call from (414) 915-9963 (Anthony Burke). Burke called Cubie and Cubie said that he was going to call him. Cubie needs Burke to take "two jerseys" over to "Q". Cubie says he is going to give Burke Q's number(414) 517-8350. They talk about a fight that was resolved.

- 11:59 a.m., target telephone #1 called (414) 517-8350 (Ronald Q. Terry). Cubie calls Terry and says "Oh that's your girl's number." Cubie says he will call back on Q's phone.

- 12:26 p.m., target telephone #1 received a call from (414) 372-9065 (Magic). No answer, voice mail, no message.

- 12:27 a.m., target telephone #1 received a call from (414) 372-9065 (Magic). "Matty" called and Cubie said that he will call him back around 2 p.m. and they'll get together then.

- 12:34 p.m., target telephone #1 received a call from (414) 460-5909 (Ronald Q. Terry). Cubie asked Terry if "T" (Anthony Burke) got over there yet. Cubie asked Terry if a subject dropped off the paperwork. Terry said that he didn't get the "money" from him. Cubie talked about a subject owing him for jerseys and DVD's. Cubie told Terry he'll meet up with him later, "about 2:30-ish."

- 1:16 p.m., target telephone #1 called (414) 649-9679 (Edward Cubie). No answer, but Cubie was speaking to a female in the background as the phone rang. Cubie said he is trying to get that "weed up outta here'. The female asked if Cubie has been smoking it.

- 1:31 p.m., target telephone #1 received a call from (414) 649-9679 (Edward Cubie). Ed called Mark and they talked about people that have to go and cash checks to pay Ed who in turn will give the money to Mark. Ed said he wants two different types of jerseys. Mark says OK. Mark said that he would be leaving shortly.

- at 8:20 p.m., target telephone #1 received a call from target telephone #3 (Lopez). Lopez asked Cubie if he was watching the game. Cubie said he is not watching the game he is trying to figure out his calculations (money collection for drug money owed to Lopez) because they were not adding up correctly. Cubie said he would call back later.

- On May 7, 2005, at 7:48 p.m., target telephone #1 received a call from target telephone #3 (Lopez). Lopez asked Cubie how things were going (money collection). Cubie said that it was rough and that he is trying to tighten it up. Lopez said that is fine and asked what time can Cubie come tomorrow. Cubie said that he can be there about 12:00 noon or 1:00 p.m. Lopez agreed to the time and said no later then that. Cubie said no later than 1:30 p.m. Lopez said okay. Cubie said he has the balance of that bounced check for him and some more to go along with it. Cubie said that he would not be able to make it to Chicago today. Lopez said no problem. Cubie said he will call Lopez in the morning to let him know exactly what time he is coming.

- On May 8, 2005, at 5:03 p.m., target telephone #1 called target telephone #3 (Lopez). Cubie asked Lopez if Lopez was going to meet Cubie at the office and Lopez replied yes. Shortly after this call, surveillance observed Cubie arrive at Lopez' office at 1675 N. Western Avenue, Chicago and carry large paper shopping bag with handles into the office. Based on monitored conversations earlier in the day, it is believed that Cubie delivered a substantial amount of money to Lopez in the white shopping bag. Shortly after Cubie drove from the

area, surveillance observed two Hispanic males walk into Lopez' office. After a few minutes, the two Hispanic males walked out of the office and walked away from the building. One of the males, the one wearing a jersey with the number "07" on it, appeared to be holding something under his shirt with his left hand as he looked up and down the street.

- On May 9, 2005, at 6:31 p.m., Jelks used Cubie's telephone and called an individual only known as "Silk" to check on when Silk would be arriving in Milwaukee. Jelks ended the call by saying "...don't get pulled over with that shit." Based on the calls before and after this conversation, I believe that Jelks had arranged for Silk to bring heroin to Milwaukee for distribution by the Cubie organization. Monitoring later established that Silk got into a car accident on I-94 heading north to Milwaukee.

- At 8:31 p.m., Jelks used Cubies telephone and called an unknown female who asked Jelks where she can "get some" (drugs). Jelks discussed the rollover accident involving Silk.

- 9:10 p.m, target telephone #1 called target telephone #3 (Lopez). Lopez and Cubie discussed meeting in order for Cubie to pay money to Lopez on Cubie's debt. They discussed meeting on May 11 or 12. Lopez was exited and said that he would have enough time to all three rooms (supply Cubie with 3 kilograms or more of cocaine).

56. From May 10-16, monitoring and surveillance established that Cubie was collecting money from his most recent shipment of cocaine. Cubie was in regular and frequent contact with Nickison, Ronald Terry, Anthony Burke, Delano Hill, Edward Cubie, and his source of supply. Cubie was collecting the money in order to pay his source and acquire additional amounts of cocaine. On May 12, 2005, Cubie was notified that someone stole money from his stash house at 2945 N. 53rd St., Milwaukee WI. From May 12 until May 16, 2005, Cubie, Nickison, Terry, Burke, Hill, Bridges, Long and others had numerous conversations about the stolen money. By May 16, 2005, Cubie, Nickison, and Terry concluded that Jan Long and Robert Bridges were responsible for the stolen money and planned to harm Long and Bridges. Long owns the duplex at 2945 N. 53rd St. For example:

- On May 11, 2005, Cubie received a call from Delano Hill. Cubie says he can't give him his, he can only give him the twenty nine and it is up to DH. DH says okay he will just do one

of them then. MC says it is to late for him tonight to get his but he will be ready tomorrow. DH says he will just wait until tomorrow. MC asks what is up with Little Boy. DH says he should be ready tomorrow too. DH says he will call Little bro (Andre Hill) and will call him right back. MC says he will hold it down until then. MC says he has to drop his old lady off to work so he has to roll through there any way.

- At 1:45 p.m., Cubie called Ronald Terry. Cubie asked if he needs him to stop through. Terry says that did not even go through but it is all good (cocaine). MC asks if Daddyo(Nicksion) gave him the purse (money). Terry said yes that it is all secured. Cubie said he will use that bag then. RT says that is all good.

- On May 12, 2005, Cubie received a call from Robert Bridges. Bridges is the uncle of Orlandes Nicksion. Bridges told Cubie that Jan Long was pulled over somewhere on 27th. UM says you know they (Police) coming back over here B. MC says you can bet your ass on that.

- At 2:43 p.m., Cubie received a call from his brother, Edward Cubie. Edward asks Mark if he still needs some Flinstone vitamins.. says he has a jar. Mark says he will call him back on that one. Edward asks if there is something wrong if something is shaky he should let him know. It's not good to have everyone worried so if you need to talk to let him know. Edward stated that he doesn't want to be in his business but if Mark wants he can offer his opinion. Edward says he is his brother and he loves him.

- At 4:28 p.m., Terry called Cubie and told Cubie to get out of 2945 N. 53rd St. and said that if she (long) didn't just call 911 then who the fuck did she call. Ronald says this is about accountability. Ronald says the girl knows what's going on. Ronald says "we got some more money for Leon, we got some more money for Leon so we know what's going on. Ronald insists that "B" (Cubie) gets out of the house.

- At 6:26 p.m., Terry called Cubie and said "she took it upon herself, it was a set up" That was all gay, that can't walk up in there. All I know you been implicated.

- At 6:27 p.m., Terry (Q) called Cubie and told Cubie that the mother fuckers think this is a game. Cubie asked why she is telling her to come over here. Cubie then says why is she telling Brenda to come over here. Q is telling the female ( Brenda ) in the back round to go over there. Cubie says she had two bags, she had to give it to somebody. Q keeps on saying that the mother fuckers think this a game and he's not playing. Q says who's gonna get you out of this shit, when you pulled over by these chumps. Cubie says ya with that shit. Q continues to say that this is not a game. Cubie says things are fucked up, fucked up real bad.

- On May 13, 2005, at 11:55 a.m., Nicksion (ON) called his wife, Cristela Nicksion (CN), and talked to Cristela about the police going to Ronald Terry's house. ON tells CN that some lady put a move down on Terry. On says yesterday morning the police came over there about

8:00 am and Rob and a dude was in the house at the time. ON says the police did not have a warrant and they did not let police in. ON says that Rob told him that he gave the bag to Jan Long so she could take it to work. ON says Rob calls him back and says Jan was later traffic stopped by the blue and whites and was out an hour later on bail for a $1000.00. CN says "Shut the fuck up" Oh my god shut up you all got some motherfucking pumpkin heads. CN asks what did Jan have, was it clothes, jewelry, or Dinero.ON says it was both. CN says Oh unt ah come on now.CN says what would they even take Jan Longs car Lando. CN says Jan Long Okay they would check me before they would check her. ON says Jan is trying to claim that this was an extention to the incident that happened at the motherfucking house. ON says the first part of her story was she (Jan) was stopped on 27th and Burliegh St. then she said she was pullled over on the East side. CN says Oh my god see she is playing, she then says she will call him on the other phone.

- At 1:33 p.m., Nicksion called Cubie and said that he was heading over there (2945 N. 53rd St.) to give her (Long) an ultimatum. Cubie says he's getting his shit together. Nicksion says that she can't produce no $1,000 out of her bank account. This whole thing is bullshit and Cubie isn't spending 2 weeks going through the motions. Nicksion says that she is accountable for that bag. If you give someone something to hold on to they are responsible for that. Cubie says that it was a cut move and she saw an opportunity and took it. She is in kahoots with that stud. Cubie says he ain't got no mother fuckin time for this.

- On May 15, 2005, at 3:59 p.m., Jelks used Cubie's telephone to call "Tanya" and asked Tanya to call Silk on a three-way call. Jelks then asked Silk if he still wants to do that (heroin deal) and he responds no. Jelks then asked if when Silk would be ready and Silk said the next day. Jelks then stated that she wanted to give Silk back his money.

- At 6:54 p.m., Cubie called Anthony Burke and talked about getting together and talk about what is going on. CUBIE suggests that everyone should get together and discuss what is happening. He says when the corporate have meetings, just like in the GodFather, everybody has to come up with a report, what they feel about the situation and then they vote on it, so everybody has to come up with ideas and we have to vote on which one we need to do. Cubie and Nicksion say they can't let this stuff ride a whole week, Anthony Burke says no like tomorrow. They are talking about meeting each other tonight. Talking about going somewhere but it is closed. CUBIE says Q is out of town. Anthony Burke says "Q" has to be there because he is a real corporate player.They finish up by saying they are going to meet later tonight in about an hour or later.

57. On May 16, 2005, case agents conducting surveillance observed Cubie, Nicksion, Burke and Terry meet throughout the afternoon at a location on the north side of Milwaukee. This meeting occurred after monitored conversations indicated that the four were going to meet to discuss

the stolen money and/or drugs that were taken out of 2945 N. 53rd St. (the stash house). Not l ong after that meeting, Jan Long and Robert Bridges, the residents of the lower duplex at 2945 N. 53rd St., began receiving telephone threats regarding stolen money and/or drugs. Jan Long is the owner of the duplex, Robert Bridges is her boyfriend and the uncle of Orlandis Nicksion.

58. Based on the investigation to date, case agents located and arrested Mark Cubie, Orlandis Nicksion, Edward Cubie, Anthony Burke, and Machelle Jelks for their involvement in the above described drug trafficking and money laundering activities. Mark Cubie and Nicksion were taken into custody at 5634 W. Oklahoma Avenue. A search warrant obtained for that location during the evening of May 16, 2005, resulted in the recovery of approximately $10,000.00 cash, approximately ½ pound of marijuana, numerous California safes, a money counting machine, ammunition and drug notes. Cubie is a convicted felon. The drug notes were contained in notebooks that listed various nicknames corresponding with believed distributors of Cubie's cocaine. Next to the names were dollar amounts of money owed. Nicknames corresponding to Edward Cubie, Anthony Burke, Delano Hill and other known distributors for Cubie.

59. Other documents recovered at Cubie's residence indicated that he has bank accounts at Guardian Credit Union in Milwaukee. Subpoenaed records indicate that Cubie has approximately $3,008.26 in a checking account, Account No. 78005, and approximately $2,115.55 in a savings account, Account No. 78005.

60. Anthony Burke was arrested at 4260 W. Highland, Apt. 4, Milwaukee, WI. He consented to a search of his residence and $20,000.00 in cash and a 2002 Cadillac were seized.

61. Edward Cubie was arrested at 5533 W. National Ave., Apt. 107, Milwaukee, WI. He consented to a search of his residence however nothing of evidentiary value was recovered.

62. Machelle Jelks was arrested at 3306 W. McKinley, Milwaukee, WI. A custodial search of her person revealed .52 grams of heroine.

63. Also during the evening of May 16, 2005, a search warrant was obtained for Nicksion's residence at 8666 S. Chicago, Apt. 13, Oak Creek, WI. $2,000.00 in cash and a semi-automatic firearm were recovered during the search. Nicksion is a convicted felon.

64. Both Jan Long and Robert Bridges were independently interviewed by case agents. They both indicated that Robert Terry was using the upper residence at 2945 N. 53rd St. to traffic drugs. They also indicated that they had seen Orlandis Nicksion and Mark Cubie at the upper residence with Ronald Terry on several occasions. Both also indicated some time on May 12, 2005, MPD officers came to 2945 N. 53rd St., on a drug complaint. The officers attempted to gain access to the upper residence, however no one answered the door. Shortly after the officers left, Ronald Terry came down to the lower residence, their residence, and brought down a briefcase that they both believed to contain cocaine. Jan Long took the cocaine and placed it in her garage.

65. According to both Long and Bridges, it was after this incident that they began to receive threats from Nicksion, Terry and Cubie. The threats continued and escalated in severity up to the late afternoon hours of May 16, 2005.

66. During the early evening hours of May 16, 2005, case agents conducting surveillance at 2945 N. 53rd St., observed a person they later identified as Javern Taylor exit the lower of 2945 N. 53rd St. Taylor was carrying a gun case and suitcase. Taylor entered a vehicle, began to leave the area. Believing that Taylor was involved with the drug trafficking and threats stemming from that location, he was stopped. As case agents approached the vehicle, Taylor put his hands out the

window and stated that he had a gun in the trunk. A subsequent consent search of the trunk revealed a semi-automatic firearm and approximately 9 ounces of cocaine.

67. During a post arrest statement, Taylor stated that he drove from Memphis to Milwaukee shortly after his mother, Jan Long began receiving threats on May 12, 2005. Taylor stated that over the weekend he went into the detached garage at 2945 N. 53rd St., to find the lawn mower to mow the lawn for his mother. He indicated that while in the garage he found the bag containing the cocaine which he placed in a vehicle in the garage. Taylor gave consent to search the garage and vehicle and case agents recovered approximately 1 3/4 kilograms of cocaine, 1 ounce of crack cocaine and six pounds of marijuana.

## IV. CONCLUSIONS

68. I believe that this affidavit establishes probable cause that: **Mark A. Cubie, Orlandes Nicksion, Ronald Q. Terry, Anthony L. Burke, Delano Hill, Edward Cubie, Sylvester Pigram, Cristela Nicksion**, and **Machelle Jelks** have been involved in the sustained distribution of cocaine in the Milwaukee area since at least August of 2004. This information also establishes probable cause that individuals have earned a large amount of money as a result of their drug trafficking activities, which they have invested in assets including a business, vehicles, and other assets.